# EXHIBIT P

Sandra Carson

| | |
|---|---|
| From: | Mary Williams <marycwilliams1121@gmail.com> |
| Sent: | Wednesday, September 22, 2021 10:44 AM |
| To: | Sandra Carson |
| Subject: | RE: Engineering Expert Rebuttal Report on Defendant's Testimony |
| Attachments: | Engineering Expert Rebuttal Report Williams v Aviles 2021.pdf; Williams v Aviles Engineering Expert HVAC system 2021.pdf; Bramel CV long Form 2021.pdf |

| | |
|---|---|
| Follow Up Flag: | Follow up |
| Flag Status: | Flagged |

Ms. Carson,
As I notified you shortly after the Defendant's depositions in April 2021, I wanted a rebuttal report on the Defendant's statements as to how he installed the gas pipe.

It has taken some time to complete only because I had to provide the transcript and other documents to him. He has been able to complete an short version for your review.

Mary C. Williams, Esq.

Confidentiality Notice: This communication is for use by the intended recipient and contains information that may be privileged, confidential or copyrighted under applicable law. If you are not the intended recipient, you are hereby formally notified that any use, copying or distribution of this communication, in whole or in part, is strictly prohibited. Please advise the sender immediately by reply e-mail and delete this message and any attachments without retaining a copy. This communication does not constitute consent to the use of sender's contact information for direct marketing purposes or for transfers of data to third parties.



## Bramel Engineering

316 Fairhaven Rd.
Tracys Landing, MD 20779
p | 443.852.3413
www.bramelengineering.com

9/22/2021

Mary C. Williams, Esq.
1629 K St. St. NW, SUite 300
Washington, DC  20006
202-669-0760

Reference

Project:             Gas Line Leak

Location:         1257 Carrollsburg Pl SW, Washington DC

Ms. Williams,

   Per your request, I have investigated the furnace and gas line installation, installed in your residence by Julio Aviles, at 1257 Carrollsburg Place SW in Washington DC, on or around 11/21/2016.  The installation, specifically the black iron pipe and union installed at the location, allegedly leaked and led to an uncontrolled gas leak within the residence.  Since the installation has been modified at this time, the investigation of the matter has been limited to review of the file and depositions to date.  The purpose of this report is to determine, to the extents possible, if the black iron gas lines, including the ¾" union that was alleged to leak, was installed per applicable building codes and industry standards.

## Investigation

The following items were reviewed:

   1.) DCRA Building Code

   2.) Trane invoice and contract

   3.) Trane Warranty

   4.) Washington Gas Notice

   5.) Frostys heating and Cooling Invoice

Williams v Aviles

   6.) Enlightens Home Inspection Report
   7.) Invoices for service
           a.  Jiffys
           b.  McCrea
   8.) 2/22/2021 Expert Report by Mr. Nava, PE
   9.) Deposition Excerpts from Julio Aviles dated 4/23/2021


## Discussion

The black iron gas line shown in Figure 1, below, was determined to be leaking at the ¾" union.  The union was identified by Washington Gas in their SAP service order on 4/4/2017.  The leak was a "weak and intermittent" ongoing leak with odor present in entirety of house.



*Figure 1. Installed Black Iron Pipe and Leaking ¾" Union*

Williams v Aviles

A cross section of a typical ¾" black iron union is shown in Figure 2 from the industry standard ASME B16.39-2014.  The union part consists of three basic elements: head, tail, and union nut; when the outer union nut is properly tightened, the seat makes a gas tight seal.



Figure 2. Union Section Cut

Williams v Aviles

The ability of the union to properly seat and make a gas-tight seal is dependent on the union nut being properly tightened.  Guidance to the amount of torque to tighten the joint, while not fully defined by the industry standards, is given within ASME B1.20.1-2013 governing pipe threads.  Section 1.4.3 specifically discusses these torques and states:

> **1.4.3  Tightening Torque.**  Due to application-specific variables such as materials, wall thickness, operating pressures, etc., no guidance is given in this Standard regarding joint-tightening torque. However, joints should be tightened beyond the hand-tight engagement position. Advancing the joint past hand-tight creates interference between external and internal thread flanks, produces a seal (with the use of a sealant), and helps prevent loosening of the joint. Overtightening may be detrimental to the sealing function of the joint.

The ¾" union was installed by Mr. Aviles using a pair of channel locks[1].  Channel locks are a type of groove pliers that are not rated for high toque applications and are inappropriate for setting the union ring nut.   As is stated within the ASME standard, unions not properly tightened are susceptible to loosening of the joint.   The proximate cause of the union leak was Mr. Aviles' lack of following industry standards in using the correct and proper tools to ensure the union nut was properly tightened.

The house located at 1257 Carrollsburg Pl SW, Washington DC is an attached corner townhouse that was reportedly constructed in 1909.  Based on our experience, these aged homes in Washington DC allow significant air infiltration from the exterior.  In terms of engineering, the air infiltration is quantified as Air Changes per Hour (ACH), or in other words, how many times the entire volume of air is leaked out and replaced by outside air.  We are commonly seeing ACH for similar homes, when the wind isn't blowing, in the range of 3 to 6 ACH.  Additionally, the interior air exchanges with the exterior air quicker when there are significant winds.  This air exchange is not uniform throughout the building and creates areas where the air stagnates and moves.  The strength, or lack of strength, of the gas odorant is

---

[1] Deposition of Mr Aviles page 8 lines 15 to 17

Williams v Aviles

related to the air movements, which are also variable throughout the house and may or may not be fully recognized by the occupants.

## Conclusions

Based on the investigation to date, we are able to state the following conclusions within an engineering certainty:

1. The proximate cause of the gas leak was Mr. Aviles not following applicable gas building codes and industry standards in installing the gas lines.

If there are any questions and or concerns regarding this issue, please do not hesitate to contact me.

Respectfully,

Authored by:

Brian K Bramel, P.E., S.E., Ph.D.

Structural/Civil/Mechanical Engineer

I hereby certify that this report is a complete and accurate statement of all my opinions, and the basis and reasons for them, to which I will testify under oath.



**Bramel Engineering**

316 Fairhaven Rd
Tracys Landing, MD 20779
p. 443-852-3413

# ENGAGEMENT AGREEMENT

These Terms of Engagement (this "Agreement") form the basis of the working relationship between Bramel Engineering, LLC ("Bramel Engineering") and __Mary Williams____ (hereinafter, "you" or the "Client") in the matter _Williams v Aviles___(Project No.:210720-1).

**1. Respective Responsibilities.**

You are hiring Bramel Engineering to consult within the areas of expertise of our engineers.  This engagement will initiate as a consulting agreement and may transition to being that of a disclosed expert at some point in the future consistent with rules in the local jurisdiction.  Bramel Engineering will comply with discovery requests in compliance with the client's direction.

Bramel Engineering will take reasonable steps to keep you informed of progress and to respond to your inquiries. As a term and condition of this Agreement, you agree:

- To provide all relevant documents, discovery, deposition transcriptions, and other pertinent information as soon as reasonably possible.
- To provide Bramel Engineering, to the maximum extent possible, access to all relevant physical evidence for inspection, evaluation and testing, as agreed by the parties.
- To provide Bramel Engineering with copies of or access to all tests and test results, studies and other information and materials related to the matter prepared, performed or provided by other experts, consultants, witnesses and parties to the matter.
- To authorize and fund any testing and/or studies which are reasonably necessary to support Bramel Engineering's testimony and/or opinions prior to deposition or trial.
- To keep Bramel Engineering fully informed of developments in your matter, such as trial and deposition dates, settlements, and motions in limine to exclude expert testimony and motions for protective orders.
- To provide scheduling orders as soon as they are issued by the court
- To notify Bramel Engineering of any deadlines and appearances that involve Bramel Engineering; to oppose any motions in limine to exclude testimony by Bramel Engineering and provide Bramel Engineering with a reasonable opportunity to assist in the preparation of the written opposition to any such motion.
- To maintain a current account for fees and costs.
- To undertake other activities necessary, appropriate and convenient, to allow Bramel Engineering to fulfill its responsibilities.

Bramel Engineering

### 2. Representation:

You have full legal and corporate power and authority to enter into this Agreement and you shall be primarily liable for all terms and obligations of this Agreement whether acting on your own behalf or on behalf of your Client.  Neither you or your Client is subject to any agreement or constraint that would prohibit, restrict or adversely affect your right or ability to enter into, or carry out your obligations under this Agreement. When executed, this Agreement will become the legal, valid and binding obligation of the respective parties, enforceable against each other in accordance with its terms.

### 3. Fees and Billing.

Bramel Engineering (Federal Tax ID 20-1382447) will charge you a retainer fee of __300.00_____ for consulting services. The retainer will be held in escrow against billed work.  Bramel Engineering has the right to request for the retainer to be refreshed as required.

Billing rates for individual engineers will be provided on a separate rate sheet.  Billing rates may be adjusted at Bramel Engineering's discretion no more than once per year.  All billable time (work, travel, and/or depositions and trials) are charged at the same rate.  Travel time will be charged as portal-to-portal. Expenses will be charged without markup. These expenses could include, but are not limited to travel expenses (fares, mileage, tolls, hotels, rental car, meals, etc.), exemplar purchases, copying, postage, etc. Should testing be requested, a written protocol and estimate of costs will be submitted to you for approval upon request.

Bramel Engineering will typically bill at the completion of major milestones (inspection, report, deposition, etc.) but reserves the right to bill at Bramel Engineering's discretion.  You may request a current invoice at any time, otherwise invoices will not be submitted more frequently than monthly.  All invoices are due within thirty (30) days; any invoice due over ninety (90) days may result in work suspension. All invoices are priced for immediate payment. Overdue invoices (beyond 90 days) will incur a penalty equivalent to 1% per month, retroactive to the original billing date after 90 days has elapsed. Additionally, all open balances more than 30 days outstanding must be paid in full prior to additional out-of-town travel, inspections, depositions, or trial testimony. In the absence of any written objection within thirty (30) days of the date of an invoice, you will be deemed to have accepted and acknowledged the invoice as correct. You agree that the payment of Bramel Engineering is the sole responsibility of you, and not of the party whom you represent.

You agree to review invoices and will advise Bramel Engineering within 30 days of receipt if of each invoice as to any objection regarding the form or substance of the invoice. Also, you will keep Bramel Engineering informed of any changes to the nature of scope of the engagement to ensure that fees do not exceed expectations. The adversarial nature of litigation can lead to challenges regarding admissibility of testimony and exhibits however, any limitation by the court will not relieve you of liability of our fees and expenses.

### 4. Discharge, Withdrawal, Completion and Records.

Either party may discharge the other or stop work at any time by providing written notice to the other party. You shall remain liable and responsible for payment for such pro-rated portion of the services and work actually performed by Bramel Engineering prior to termination.  Project files will be maintained in accordance with Bramel Engineering's Document Retention Policy (Bramel Engineering project files are typically retained indefinitely for open matters and are retained for three years after expiration of the deadline for filing appeals for closed matters).

Bramel Engineering

### 5. Disclaimer of any Guaranty.

Any estimate of fees is an approximation and is not a warranty as to the actual fees and costs of the services rendered, the full amount for which you are responsible.  Nothing in this Agreement nor any statement made to you is to be construed as a promise or guarantee about the outcome of Bramel Engineering's efforts on behalf of your client and fees are not based on or in any way related to the outcome of a given matter. Bramel Engineering makes no guarantees as our statements, whether oral or written, are those of opinion only. By entering into this Agreement, you agree that you have undergone the necessary due diligence to review the supporting engineer's credentials and have elected, at your sole discretion, to retain Bramel Engineering's engineer based on your own assessment of their suitability for your matter.  Bramel Engineering can make no guarantee that its engineers will be allowed to testify by the court.

### 6. Daubert, Frye, Rule 702 Hearings, Etc.

You agree to notify Bramel Engineering immediately upon notice of any court proceeding concerning or questioning the competency of our engineer's testimony or qualifications in this matter. This applies to motions variously known as Daubert, Frye, Rule 702, etc. To the extent permissible under the forgoing court proceedings and provided such action remains in the general interest of the Client, you agree to vigorously oppose any such motions and take such actions as reasonably necessary to support the competency and qualifications presented by Bramel Engineering in this matter. In the event that Bramel Engineering engineer testimony depends upon the work product of an expert in a related field, you agree that if such an expert has not been retained or has not issued a report with the necessary foundation and support for Bramel Engineering engineers expert witness opinions, or has been excluded by Daubert/Fry/Rule 702 type court proceedings, then Bramel Engineering has the right at our sole discretion to either (a) conduct the necessary testing or research at your expense or (b) withdraw from the case before any court submissions are made or hearings are held.  If such a withdrawal occurs, the client agrees to pay any outstanding balance due at the time.

### 7. Limitation of Liabilities.

The maximum liability of Bramel Engineering by any avenue shall be limited to the total amount of invoices paid by you under this Agreement. Bramel Engineering shall not be responsible to you, or any third party, for any consequential damages, including, but no limited to, loss in litigation, lost profits, business interruption, or other direct or indirect loss.

### 8.  Evidence Storage

If evidentiary materials are sent to or produced by Bramel Engineering, a good-faith effort to preserve the materials will be made. You will hold Bramel Engineering harmless if these materials are lost or damaged due to theft, fire, or other unintentional circumstance.  Bramel Engineering reserves the right to charge you for storage of evidence.  Evidence will be maintained, and charges will accrue until Bramel Engineering receives notice, in writing, that the evidence can be disposed and how the evidence is to be disposed (e.g. returned to owner or destroyed).  Bramel Engineering reserves the right to charge you for disposal costs (packaging, shipping, etc.).

### 9. Indemnification

You shall defend, indemnify and hold Bramel Engineering harmless against all claims against Bramel Engineering related to Bramel Engineering's performance under this Agreement. This obligation to indemnify

Bramel Engineering

expressly includes any client or associate of yours. You shall not settle any Claims involving Bramel Engineering without the consent of Bramel Engineering, whose consent shall not be unreasonably withheld.

**10. Bramel Engineering Work Product.**

You acknowledge that all work product generated by Bramel Engineering as well as any and all materials acquired by Bramel Engineering for testing or other research purposes, whether or not paid for or reimbursed by you does and will belong solely to Bramel Engineering, except as provided by the following explicit license to you in this Agreement. You will not distribute Bramel Engineering test property to third parties without Bramel Engineering's written permission. Bramel Engineering grants you during the term of this Agreement, a limited, non-transferable, non-exclusive temporary license to use the Bramel Engineering Work Product for the sole purpose of personal review by you and other attorneys in furtherance of advocacy of the client for whose matter which have been hired. You have no rights to grant any sublicenses, provide copies of or allow the viewing, inspection or examination of any Bramel Engineering Work Product or Bramel Engineering Test Property, except as explicitly agreed in a signed writing. Notwithstanding the foregoing, nothing in this Agreement waives Your right to claim work product protection over any materials generated by Bramel Engineering with regard to the claims of any third parties to discover such materials in litigation.

**11. Remedies.**

Each party acknowledges that a remedy at law for any breach or attempted breach of this Agreement will be inadequate, agrees that each other party shall be entitled to specific performance and injunctive and other equitable relief in case of any such breach or attempted breach, and further agrees to waive any requirement for the securing or posting of any bond in connection with the obtaining of any such injunctive or other equitable relief. The waiver of any breach of this Agreement by any party shall not be deemed to be a waiver of any preceding or subsequent breach, nor shall any waiver constitute a continuing waiver.

**12. Attorneys' Fees.**

If any legal proceeding is brought to enforce or interpret the provisions of this Agreement or an attorney is employed to collect your account or collection activities undertaken, the prevailing party shall be entitled to recover actual attorneys' fees and costs, which may be determined by the arbitrator in the same action or in a separate action brought for that purpose. The attorneys' fees award shall be made as to fully reimburse for all attorneys', paralegal and experts' fees, costs and expenses actually incurred in good faith, regardless of the size of the judgment, it being the intention of the parties to fully compensate for all attorneys', paralegal and experts' fees, costs and expenses paid or incurred in good faith. Any judgment shall contain a provision for the recovery of actual attorneys' fees in enforcing and collecting the judgment, with the recoverable fees and costs to include post-judgment motions; garnishment, levy and debtor or third-party examination; discovery; bankruptcy litigation and other collection activities.

**13. Miscellaneous.**

This Agreement and all ancillary documents and arrangements are deemed to have been made in Anne Arundel County, Maryland, and the validity and enforcement thereof, shall be determined and governed in accordance with the laws of Maryland, without regard to conflicts of law rules. Should any part of this agreement for services be found to be invalid or unenforceable for any reason, the remainder shall not be affected thereby. The invalid or unenforceable part shall be modified or changed by the parties to carry out the intentions and directives stated in this Agreement. The language of this Agreement shall be construed simply according to its plain meaning and shall not be construed for or against either party. Neither party may assign this Agreement or any part thereof without the prior written consent of the other party.

Bramel Engineering

**13. Entire Agreement.**

This document constitutes the entire agreement between you and Bramel Engineering regarding the terms and conditions of our services and no other agreement or modification, either prior to or after this Agreement, will be binding, unless it is in writing signed by all parties.

**14. Force Majeure.**

Any delays in, or failure of performance of either party, shall not constitute default or give rise to any claim for damages if and to the extent caused by or resulting from acts of God, earthquake, fire, explosion, flood, the elements, pandemics, strikes, lockouts, boycotts, picketing, labor disturbances or differences with workmen, equipment malfunction, acts of the public enemy, war, rebellion, riots, acts of the Government (Federal, State, or municipal), or any cause whatsoever beyond the control of the party in default, but performance hereunder shall be resumed with all dispatch as soon as the cause preventing performance has been removed.

_____          8/10/21
Brian K. Bramel, P.E., S.E., Ph.D.                                Date

Bramel Engineering, LLC


_____          _____
Client                                                            Date

# BRIAN K. BRAMEL, P.E., S.E., Ph.D.

316 Fairhaven Rd.
Tracys Landing, MD 20779
443-852-3413 (cell)
bbramel@brameleng.com

## Experience

### Bramel Engineering, June 2004 - Current – Principal

Practicing Forensic Structural/Civil/Mechanical Engineer. Offers complete forensic analysis inspections, calculations and expert witness testimony for Structural/Civil/Mechanical issues as well as construction accident litigations. Due to the breadth of training and experiences, I provide broad perspective solutions to complicated matters for both Plaintiff and Defense clients on a wide variety of projects ranging from residential inspections to multiple death construction accidents. Strengths include but are not limited to: OSHA Analysis, Structural Analysis, Cost Estimating, Building Code Issues, Engineering Design, Construction Project Management, and Accident Reconstruction. Extensively deposed and served as Trial Expert Witness in multiple cases.

### TB Engineered Designs, November 2015 to Current - Principal

Practicing Engineer. Offers total design and fabrication drawings for light-gauge, structural steel, masonry and steel-concrete composite construction clients. Work includes but is not limited to conceptual design of structures, total building design and analysis, component design and analysis, and construction-site problem solving. Ongoing work includes but is not limited to operating as EOR, design work for sheeting/shoring, design work for foundations and base building structures.

### University of the District of Columbia, Aug 2015 to Current
### Adjunct Professor

Adjunct Professor for Department of Architecture teaching Structural theory to Architectural Students. Courses include Statics and Strength of Materials, Theory of Structures, and Structural Steel Design.

### FORCON Maryland Ltd, February 2013 to 2018 –Forensic
### Structural/Civil/Mechanical Engineer

Practicing Forensic Structural/Civil/Mechanical Engineer. Conducted forensic analysis inspections, calculations and served as expert witness for construction/structural/ and construction accident litigations. Provided expert testimony for both Plaintiff and Defense clients on a wide variety of projects ranging from trip and falls to first responder insurance inspections.

### CED Investigative Technologies, Aug 2009 to January 2012 –
### Structural/Civil/Mechanical Engineer

Practicing Structural/Civil/Mechanical Engineer. Conducted forensic analysis inspections, calculations and served as expert witness for construction/structural/ and construction accident litigations. Provided expert testimony for both Plaintiff and Defense clients on a wide variety of projects ranging from residential inspections to multiple death construction accidents. Strengths include structural OSHA analysis, Structural Analysis, Cost Estimating, Building Code issues,

Engineering design, Construction Project Management, and Accident Reconstruction. Extensively deposed and served as trial expert witness.

**Engineered Framing Systems, January 2003 – June 2004 – Project Structural Engineer**
Practicing Structural Engineer working in the fast-paced Design-Build environment. Work is centered on light-gauge construction of multifamily multistory buildings. Work includes solving field issues, design of new structures, light gauge and structural steel design, and concrete transfer slab design. Directed the design and the means and methods for panelized light gauge multifamily structures in Maryland, New Jersey, and Massachusetts.

**Theobald Bufano and Associates, April 2001 to January 2003 – Structural Engineer/Project Manager**
Practicing Structural Engineer in Washington DC working for a mid-size firm responsible for the structural construction phases of two significant cast-in-place 12-story concrete buildings, the inspection of concrete balcony repairs for major apartment complexes, the design phases of multiple smaller building rehabs, and the initial investigation of multiple feasibility studies. The construction phase work centers around fielding construction question and concerns, shop drawing evaluation and authorization, spot checking the rebar placement and inspection programs, and designing repairs for the contractor mistakes. The investigation of the balcony repairs includes the direct evaluation including sounding, observations, and physical testing of 400+ cantilevered concrete balconies on a twelve-story apartment complex. The most common small project designed are two-way concrete slabs being evaluated and designed for change conditions such as new stairs, larger loads, slab penetrations, and proposed additions. Some of the designs for contractor omission and or mistakes are shear collars, new load bearing walls to replace misplaced columns, retrofit steel beams for omitted concrete beams, anchor alterations, severed bar splices, wrong elevation slabs, etc. The feasibility studies conducted have been for minor jobs, such as change use for fitness facilities, elevator installation in mansions, corroded pan deck investigations, and open web joist corrosion evaluations.

**NAHB Research Center, Inc., August 1999 to April, 2001- Project Manager**
Involved with projects related to road mapping, physical testing, design methods, building code submittals, and in-situ housing condition assessments under contracts to HUD, PCA, NAHB, and others. In particular, I was the project manager responsible for a pilot study to statistically evaluate the in-situ condition of housing stock in the United States, the Panelized Construction Portfolio, and Concrete Wall ICBO Evaluations, among others. Besides being active in the development of code submittals, I also worked to ensure that the concerns of residential home builders are being heard on the various structural design standards committees such as ACI 332 and ASCE 7.

**Reiman Corp. Construction, March 1998 to May 1999 - Project Manager/Structural Engineer**
Employed as a Project Manager and Structural Engineer for a six-state bridge and commercial General Contractor. Duties included project management and engineer of record for projects, ranging in scope from interstate bridge jacking with live traffic flow to small commercial renovation designs.   Also developed the concrete form designs for 15 superintendents. Active in the construction process design, bidding, project evaluation, and direct management of the project

superintendents of awarded projects. A project of particular reward was the initial construction process design for the Timber Fishing Bridge in Yellowstone Park.

### University of Wyoming, August 1995 to May 1999 - Graduate Research Assistant
Primary investigator on developing material and design guidelines for Asphalt Plug Joints, a class of bridge expansion joints for the States of Colorado and Wyoming. These joints are highly visco-plastic, temperature sensitive pavement segments which span from the stationary pavement to the moving bridge deck. These joints required developing high-level time, temperature, and demand interrelations for the mathematical modeling of their physical behavior that was paramount to their understanding and design. The research yielded a complete understanding of their behavior and limitations that was brought back to a simple and easily understandable design methodology that is being implemented in Wyoming today.

### Caterpillar, Inc., August 1990 to August 1995 - Design Engineer, Construction and Mining Trucks
Responsible for the design, analysis, and implementation of various systems for the Construction and Mining Trucks division of Caterpillar, Inc. This business unit focused on the 35-ton through 100-ton payload capacity rigid frame mining trucks typically used for civil infrastructure construction and small stationary mines. Responsibilities included Suspensions, Steering, Transmissions, Autonomous Mining Truck Program, Structural Analysis, and Regulatory Compliance. I also worked as a research engineer for the Articulated Mining Truck Program. Specific duties included developing, verifying, and interpreting dynamic simulation analytical models that predicted the ride characteristics for various design options during product development. These models were used to gain knowledge and insight prior to actual test-vehicle construction.

### Kansas State University, January 1989 to August 1990 - Graduate Research Assistant
Conducted research funded by Boeing Military Aircraft on bolt loading of IM6/PEEK composites. IM6/PEEK is a carbon fiber reinforced thermoplastic material used in aircraft skins. This research required building finite element models using the orthotropic material behavior of the composite laminates. These models were analytically loaded through all possible orientations to determine the most critical orientations. Finally, constructed actual coupons were constructed and loaded utilizing a controlled load frame to create a correlation between the controlled experiments and finite element investigation. A reasonable correlation between the analytical and experimental results was developed.

## Education
1999 Doctorate of Philosophy in Civil Engineering,
Structural Engineering Focus
University of Wyoming
1990 Master of Science in Mechanical Engineering
Theoretical and Applied Mechanics Concentration

Kansas State University
1988 Bachelor of Science in Mechanical Engineering
Machine Design Emphasis
Kansas State University
1983 Building Trades Vocational Program
Residential Construction
Decatur Area Vocational Center

## Professional Registrations and Awards

Registered Structural Engineer
    District of Columbia
    State of Illinois - Inactive
Registered Professional Engineer
    State of Pennsylvania
    State of Florida - Inactive
    State of Ohio - Inactive
    State of Maryland

State of New York
State of Virginia
State of Delaware
State of West Virginia
1996-1999 Eisenhower Transportation
Research Fellowship
Federal Highway Administration
OSHA 10 and OSHA 30

## Representative Publications

Bramel BK (1999), Asphalt Plug Joints: Characterization and Specifications, Ph.D. Dissertation, Department of Civil And Architectural Engineering, University of Wyoming, Laramie, WY.

Bramel BK, Dolan CW, Ksaibati K, and Puckett JA, (1998), Asphalt Plug Joint Usage and Perception in the United States, Transportation Research Board 971067, Washington, DC.

Bramel BK, Dolan CW, Ksaibati K, and Puckett JA, (1998), Asphalt Plug Joints; Material Characterization and Specifications, Fifth International Conference on Short and Medium Span Bridges, Calgary, Canada.

Bramel BK, Dolan CW, Ksaibati, K and Puckett JA, (1999), Asphalt Plug Joints; Refined Material Tests and Design Guidelines, submitted for publication to Transportation Research Board, Washington, DC.

Bramel BK, Kostage, Dolan CW, and Puckett JA, (1997), Experimental Evaluation of Asphalt Plug Joints, Forth World Congress on Joint Sealant and Bearing Systems for Concrete Structures.

Bramel BK, (1995), Analytical Prediction of Ride Characteristics for D250x ADT for Various Suspension Configurations, Unpublished, Caterpillar, Inc., Peoria, IL.

Bramel BK, Swenson DW, (1990), Bolt Loading in IM6/PEEK Composites, Analytical vs. Experimental Predictions, Masters Report, Kansas State University, Manhattan, KS.